UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

FRATERNAL ORDER OF POLICE, D.C.
LODGE 1, DPS LABOR COMMITTEE,
INC.

                    Plaintiff,

                              CIVIL ACTION NO.: 07-cv-1624 (RMC)

ROBERT M. GATES, in his official
capacity as Secretary of the Department
of Defense
                    Defendant.
_____/

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Fraternal Order of Police files its Opposition to the Defendant's Motion to

Dismiss.  As further ground, counsel for the plaintiff states:

### A.

### Background

The Fraternal Order of Police D.C. Lodge 1, Defense Protective Service Labor

Committee, Inc. is the exclusive representative of all series 083 police officers employed by the

Department of Defense, Pentagon Force Protection Agency.   The FOP brought this suit on

behalf of its member rasing allegations in connection with grievances filed against the defendant.

The FOP was certified by the Federal Labor Relations Authority in Case WA-RP-80039

on May 29, 1988.  (Exh. A)  The original certification lists the Office of the Secretary of

Defense, Washington Headquarters Services, Real Estate and Facilities Directorate, Defense

Protective Services as the employing agency. *Id.*   The Pentagon Force Protection Agency is the

successor employer of the Defense Protective Service created by DoD Directive 5105.68 on May

3, 2002.[1] (Exh. B)

In furtherance of that relationship, the parties negotiated and executed a collective

bargaining agreement in December 2000 (hereinafter "Agreement").  The Department of Defense

approved the Agreement as part of agency head review pursuant to 5 U.S.C. 7114(c), and

implemented the Agreement in December 2000.  In accordance with 5 U.S.C. §7121(a)(1), the

Agreement has a grievance and arbitration procedure for the resolution of disputes.[2]   Article 51

---

[1]      While not pleaded in the complaint, the plaintiff submits Exhibits A and B as
simply historical background for the Court.

[2]      5 U.S.C. §7121(a) provides:

(1) Except as provided in paragraph (2) of this subsection, any collective bargaining
agreement shall provide procedures for the settlement of grievances, including questions of
arbitrability. Except as provided in subsections (d), (e), and (g) of this section, the procedures
shall be the exclusive administrative procedures for resolving grievances which fall within its
coverage.

(2) Any collective bargaining agreement may exclude any matter from the application of
the grievance procedures which are provided for in the agreement.

(b) (1) Any negotiated grievance procedure referred to in subsection (a) of this section
shall—
(A) be fair and simple,
(B) provide for expeditious processing, and
(C) include procedures that—

(i) assure an exclusive representative the right, in its own behalf or on behalf of any
employee in the unit represented by the exclusive representative, to present and process
grievances;

(ii) assure such an employee the right to present a grievance on the employees own
behalf, and assure the exclusive representative the right to be present during the grievance
proceeding; and

(iii) provide that any grievance not satisfactorily settled under the negotiated grievance
procedure shall be subject to binding arbitration which may be invoked by either the
exclusive representative or the agency.

of the agreement between the FOP and the defendant provides:

Section 51.01  Arbitration

a.      Within twenty (20) days following a receipt of a decision at Step 3, the party who initiated the grievance will notify the other party if it intends to submit the matter to arbitration.  Within seven (7) days after notification, the moving party will request a panel of arbitrators from the Federal Mediation and Conciliation Service (FMCS) or any other source.  Within fourteen (14) days from receiving a list of arbitrators, the Parties will select an arbitrator.  If the panel is unacceptable to either party one additional panel may be requested.  If the Parties cannot agree upon an arbitrator, they will strike one (1) name from the list alternately and then repeat this procedure until only one (1) name remains.  The person whose name remains will be selected as the arbitrator.  The party striking the first name from the list in each case will be chosen by a coin toss or otherwise as agreed.

(Comp ¶22)

The FOP has routinely filed grievances on behalf of bargaining unit employees since its certification.  The grievances pending in this matter involve AWOL, leave, medical and physical standards, performance ratings, union rights and discipline.  (Comp. ¶24)  The dispute in the case at bar involves fifteen grievances where the FOP invoked arbitration under the Agreement.  *Id.* All but two of the grievances involve federal employees. (Comp. ¶17)  The other two are institutional to the FOP.  (Comp. ¶24)

The FOP complied with the provisions of Section 51.01 in processing the various grievances for the bargaining unit employees and the FOP.  In accordance with that provision, the FOP sought and obtained various arbitration panels and was assigned a case number for each of the fifteen (15) panels received from the Federal Mediation and Conciliation Service (FMCS).  (Comp. ¶24)   For more than a year in some cases and up to three years in others, the FOP has attempted to have the defendant meet with the union and select an arbitrator from the respective

FMCS lists.  (Comp. ¶25)  The defendant refuses to meet with the FOP and select an arbitrator

from the respective FMCS lists.  (Comp. ¶26)

On September 4, 2007, the FOP wrote defendant's Personnel Director Renee Coates in a

final attempt to meet and select an arbitrator from the respective FMCS lists.  The FOP received

no response from the defendant.   (Comp. ¶27; Exh. C)   On September 6, 2007, the FOP wrote

the defendant's deputy general counsel in a final attempt to meet and select an arbitrator from the

respective FMCS lists. The FOP received no response from the defendant.  (Comp. ¶28;  (Exh.

D)  To date, the FOP received no response from the defendant and the defendant refuses to meet

with the FOP to select an arbitrator.  *Id*.

### B.

### Argument

### 1.  The Motion to Dismiss Standard Under Fed. R. Civ. P. 12(b)(6)

To prevail on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the

defendant must show "beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  A Rule

12(b)(6) motion is intended to test the legal sufficiency of the complaint. *Kingman Park Civic*

*Association v, Williams*, 348 F.3d 1033 (D.C.Cir. 2003).  The complaint need only set forth "a

short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), giving the defendant fair notice of

the claim and the grounds upon which it rests. *Conley*, supra.  "Such simplified 'notice pleading'

is made possible by the liberal opportunity for discovery and the other pretrial procedures

established by the Rules to disclose more precisely the basis of both claim and defense and to

define more narrowly the disputed facts and issues." *Id*. at 47-48. In light of these liberal pleading

4

requirements, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id*. at 45-46. The court must accept the FOP's factual allegations as true, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and draw all inferences in the plaintiff's favor. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). In the instant case, plaintiff alleged sufficient facts to survive a motion to dismiss under Rule 12(b)(6).

### 2. The Administrative Procedures Act Waives the Sovereign Immunity of the United States

Absent waiver, the doctrine of sovereign immunity shields the federal government from suit. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *Tri-State Hospital Supply Corporation v. United States*, 341 F.3d 571 (D.C.Cir. 2003). Because sovereign immunity is jurisdictional in nature, *Meyer*, 510 U.S. at 475, "the terms of [the government's] consent to be sued in any court define that court's jurisdiction to entertain the suit." *Id.* As the Supreme Court has often observed, waiver of sovereign immunity must be "unequivocally expressed in the statutory text" and "strictly construed, in terms of its scope, in favor of the sovereign." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999). A party bringing suit against the United States bears the burden of proving that the government has unequivocally waived its immunity. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

There is no doubt that §702 of the Administrative Procedures Act "waives the Government's immunity from actions seeking relief other than money damages. *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260-61 (1999); *Hubbard v. EPA*, 809 F.2d 1, 11 (D.C. Cir. 1987).

The APA provides in relevant part:

An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity . . . shall not be dismissed . . . on the ground that it is against the United States.

*See* 5 U.S.C. § 702;  *see also Jasperson v. Federal Bureau of Prisons*, 460 F.Supp.2d 76 (D.D.C.2006); *United States V. Waksberg*, 881 F. Supp. 36 (D.D.C. 1995).  APA § 702's waiver of sovereign immunity permits not only the plaintiff's APA causes of action, but the plaintiff's non-statutory and constitutional actions as well.  *See* e.g. *Trudeau v. Federal Trade Commission*, 456 F.3d 178 (D.C.Cir 2006).  However, the waiver of sovereign immunity under § 702 is limited by the "adequate remedy" bar of § 704.[3]  *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 607 (D.C. Cir. 1992) ("The APA excludes from its waiver of sovereign immunity ... claims for which an adequate remedy is available elsewhere.") As later discussed, Congress amended the Federal Service Labor Management Relations Statute in 1994, thus, making relief under the APA appropriate.

---

[3]        5 U.S.C. § 704 provides**:**

**Actions reviewable**

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsiderations, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

**3.      The Agency Action Challenged is this Matter Final Agency Action**

Whether there has been "agency action" or "final agency action" within the meaning of

the APA are threshold questions; if these requirements are not met, the action is not reviewable.

*See Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005);  *DRG Funding*

*Corp. v. Sec'y of Housing & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996).  The APA defines

an "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the

equivalent or denial thereof." 5 U.S.C. § 551(13). This list is expansive. It is "meant to cover

comprehensively every manner in which an agency may exercise its power." *Whitman v. Am.*

*Trucking Ass'ns, Inc.*, 531 U.S. 457, 478 (2001).

In determining whether such action is final, the courts "whether the agency's position is

'definitive' and whether it has a 'direct and immediate ... effect on the day-to-day business' of the

parties." *Ciba-Geigy Corp. v. United States Envtl. Protection Agency*, 801 F.2d 430, 436 (D.C.

Cir. 1986); *see also Bennett v. Spear*, 520 U.S. 154, 178 (1997) (An agency action is final if it

"mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights

or obligations have been determined, or from which legal consequences will flow.").

The defendant's refusal to comply with its contractual obligation is final agency action.

First, the denial of the plaintiff's members' constitutional rights has a direct and immediate effect

on the plaintiff's membership.  The inability to resolve disputes and the inability to protect its

member's interests strikes directly at the heart of union membership, the ability of the FOP to

effectively represent its members and is contrary to the Congressional finding that labor

organizations and collective bargaining in the civil service are in the public interest.  *see*  5

U.S.C. §7101(a)(2).

7

Secondly, the agency's reticence and rigidity in refusing to select an arbitrator evidences a calculated decision made by the agency from which adverse legal consequences have attached to the plaintiff's members. Section Article 51 of the agreement between the FOP and the defendant provides:

Section 51.01   Arbitration

a.    Within twenty (20) days following a receipt of a decision at Step 3, the party who initiated the grievance will notify the other party if it intends to submit the matter to arbitration. Within seven (7) days after notification, the moving party will request a panel of arbitrators from the Federal Mediation and Conciliation Service (FMCS) or any other source. Within fourteen (14) days from receiving a list of arbitrators, the Parties will select an arbitrator. If the panel is unacceptable to either party one additional panel may be requested. If the Parties cannot agree upon an arbitrator, they will strike one (1) name from the list alternately and then repeat this procedure until only one (1) name remains. The person whose name remains will be selected as the arbitrator. The party striking the first name from the list in each case will be chosen by a coin toss or otherwise as agreed.

There is no discretion on the part of the agency concerning the selection of arbitrators. Their obligation is clear under the agreement. They must meet with the plaintiff and if an agreement cannot be reached in the selection of an arbitrator, they must strike names until one name remains. The FOP wrote to the defendant's Personnel Director Renee Coates on September 4, 2007, asking her to have an individual contact the FOP to select an arbitrator in the above referenced matter. There was no response from the defendant's personnel director. (Comp. ¶¶38-39) The FOP wrote the defendant's deputy general counsel on September 6, 2007, in an effort to have an individual contact the FOP to select and arbitrator in the above-referenced matter. Again, there was no response from the defendant's deputy general counsel. (Comp. ¶¶40-41) To date, there has been no indication to the plaintiff that the defendant will meet to select an arbitrator for the fifteen grievances. When the plaintiff resorted to assistance by the Federal Mediation and

Conciliation Service, the defendant refused to meet with the federal mediator.  (Aff. Michael Walsh ¶ 29).  Without a doubt, this is precisely the type of final agency action which warrants review by this Court.  It is final agency action which adversely affects the employees involved and implicates their constitutional rights.

### 4.  The Failure to Provide the Plaintiff's Members With a Hearing Implicates Their Due Process Rights under the 5th Amendment

The Fifth Amendment to the United States Constitution contains a "due process" clause which provides as follows:

> "No person shall be * * * deprived of life, liberty, or property, without due process of law."

The Fifth Amendment thus requires that if the government acts to deprive any person of a "property" or "liberty" right, it must act with due process in doing so. Since law enforcement employers are, by definition, governmental agencies subject to the strictures of the Fifth Amendment, whenever they make employment decisions affecting property or liberty interests, they must do so in accord with the requirements of the Fifth Amendment. *Brd. of Regents v. Roth*, 408 U.S. 564 (1972).

Under these general guidelines, two questions arise whenever a law enforcement officer has been disciplined or subjected to an agency-imposed employment action.  First, whether the officer has a property or liberty interest in the job which has been affected by the disciplinary action. Second, whether the employer accorded the officer the necessary procedural due process prior to depriving the officer of the property or liberty interest.

In answer to the first question, the parties' collective bargaining agreement created substantive rights concerning treatment of employees, just cause and actions of the agency.

9

As it applies to the non-disciplinary actions alleged in the complaint, Section 06.06 of the parties' agreement reads:

> The Parties agree that all provisions of this Agreement will be applied fairly and equitably to all employees in the bargaining unit.

As it applies to discipline, Section 48.03 of the parties' agreement provides:

> **Standard**.
>
> Disciplinary/adverse actions may not be taken against an employee except for such cause as will promote the efficiency of the service and must be based on just cause. Disciplinary/Adverse Actions must be supported by a preponderance of the evidence and must be consistent with applicable laws and regulations governing such actions. Disciplinary actions must be determined on the merits of each individual case.

Federal law establishes the property interest of the employees represented by the plaintiff. *See e.g.* 5 U.S.C. §§7503, 7512-7513; 5 C.F.R. Part 752. The Plaintiff has alleged the property interest in continued employment of its members. (Comp. ¶18-20). In answer to the second question, the plaintiff alleged that the defendant failed to accord its members the mandated due process of law through its failure to arbitrate the various grievances which the defendant agreed to do. (Comp. ¶¶ 30, 32, 34, 36, and 38)

Once this property interest is established the procedures required by due process fall into two categories -- "pre-deprivation" and "post-deprivation"procedures. This action involves the later. It is axiomatic that a delay in the plaintiff's members hearing rights has denied them an opportunity to have a resolution of their grievances at a "meaningful time." The Due Process Clause requires provision of a hearing "at a meaningful time." *see e.g., Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985); *Armstrong v. Manzo*, 380 U. S. 545, 552 (1965)(an employee's post-deprivation due process rights can become a separate constitutional violation).

10

In *Loudermill*, the Supreme Court opined that at some point post-deprivation delay can implicate a government employee's due process rights. As noted by Justice Brennan in his concurring and dissenting opinion:

> The second issue not resolved today is that of administrative delay. In holding that *Loudermill's* administrative proceedings did not take too long, the Court plainly does not state a flat rule that 9-month delays in deciding discharge appeals will pass constitutional scrutiny as a matter of course. To the contrary, the Court notes that a full post-termination hearing and decision must be provided at "a meaningful time" and that "[a]t some point, a delay in the post-termination hearing would become a constitutional violation." *Ante* at 470 U. S. 547. For example, in *Barry v. Barchi*, 443 U. S. 55 (1979), we disapproved as "constitutionally infirm" the shorter administrative delays that resulted under a statute that required "prompt" postsuspension hearings for suspended racehorse trainers with decision to follow within 30 days of the hearing. *Id.* at 443 U. S. 61, 443 U. S. 66. As Justice Marshall demonstrates, when an employee's wages are terminated pending administrative decision, "hardship inevitably increases as the days go by." *Ante* at 470 U. S. 551; *see also Arnett v. Kennedy, supra*, at 416 U. S. 194 (WHITE, J., concurring in part and dissenting in part) ("The impact on the employee of being without a job pending a full hearing is likely to be considerable because [m]ore than 75 percent of actions contested within employing agencies require longer to decide than the 60 days required by . . . regulations'") (citation omitted). In such cases, the Constitution itself draws a line, as the Court declares, "at some point" beyond which the State may not continue a deprivation absent decision. [Footnote 2/1] The holding in this particular case, Loudermill failed to allege facts sufficient to state a cause of action, and not that nine months can never exceed constitutional limits.

*Loudermill*, 470 U.S. 553-554 (BRENNAN, J. concurring in part and dissenting in part)

In the instant case, the plaintiff alleged sufficient facts to warrant review by the Court and to sufficient facts to demonstrate it is entitled to relief under the APA.

### 5. The FSLMRS Does Not Preclude APA Review After Congress Amended the Statute in 1994

As discussed above, Congress amended the law to authorize the instant action. Yet, the government contends that the district court is required to dismiss this suit because the *Federal Labor-Management Relations Statute*, ("the Statute") 5 U.S.C. § § 7101-7135, vests exclusive

11

jurisdiction over this class of labor disputes in the Federal Labor Relations Authority (FLRA) . This contention is wrong as applied to "the traditional and well-settled authority of federal courts to enjoin unconstitutional government actions." *National Fed'n of Fed. Employees v. Weinberger*, 818 F.2d 935 (D.C. Cir. 1987)  In the case at bar, the claims asserted by the plaintiff are constitutional claims involving unconstitutional government actions.  Thus, the federal courts and not the FLRA are the appropriate forum to resolve the due process claim.

Of equal importance is the fact that the Federal Labor Relations Authority's jurisdiction extends only to claims arising from "the Statute," not constitutional claims. *See NTEU v. King*, 961 F.2d 240, 243 (D.C. Cir. 1992) (holding that a union's constitutional claim was not adjudicable in the administrative proceeding before the Authority).  The same is true as it applies the plaintiff's claim brought before an arbitrator.  It is the federal courts and not an arbitrator that should decide constitutional issues.  *See e.g. McDonald v. West Branch*, 466 U.S. 284 (1984)(arbitrator may not have the expertise to resolve complex legal questions that arise in 1983 actions); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974)(collective bargaining agreements do not preclude federal actions to vindicate certain federal statutory and constitutional rights).

In 1994, Congress amended the Statute to allow federal employees the right to redress their claims in federal court even though they may have remedies under the negotiated grievance procedures.  Title 5 U.S.C. §7121(a) provides:

(1)    Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability. Except as provided in subsections (d), (e), and (g) of this section, the procedures shall be the exclusive *administrative* procedures for resolving grievances which fall within its coverage. (emphasis added)

12

Prior to 1994, the statute did not contain the term "administrative." Rather, §7121(a)(1) provided that the grievance procedures set forth in a collective bargaining agreement would "be the exclusive procedures for resolving grievances which fell within its coverage." *Mudge v. United States*, 308 F.3d 1220 (Fed. Cir. 2002). With the 1994 amendment the Federal Circuit expressly held that the Civil Service Reform Act (CSRA) *no longer forecloses judicial review* of employment grievances that are included within a CBA's negotiated grievance procedure. (emphasis added) The Eleventh Circuit has reached a similar conclusion.

In *ASEDAC v. Panama Canal Comm.*, 329 F.3d 1235 (11th Cir. 2003), federal employees brought a back-pay claim against the United States. The district court dismissed the claim for lack of jurisdiction because of the plaintiffs' failure to utilize the grievance procedure of their CBA. Relying on the Federal Circuit's interpretation in *Mudge*, the Court of Appeals found the Federal Circuit's reasoning persuasive and adopted that reasoning. The court reversed the dismissal and remanded the matter to the district court.

More recently, the Supreme Court in *Whitman v. Dep't of Transportation*, 547 U.S. ___, 126 S.Ct. 2014, 164 L.Ed.2d 771 (2006), reaffirmed the right of a federal employee to bring an action in federal court over employment-related claims covered by a collective bargaining agreement. While not disposing of the merits of the case, the right to bring the action was confirmed and the Court remanded the matter back to the court of appeals to resolve the various procedural issues. Thus, employment grievances can be brought before the Court and that exhaustion under a collective bargaining agreement is not required.

The government attempts to frame the issue before the Court in terms of whether the *relief* to be afforded the plaintiff must originate with and emanate from the FLRA. However, the

plaintiff contends that the issue is not whether the FLRA can compel the defendant to arbitrate matters which it has contractually promised to do but whether the plaintiff *must resort* to the FLRA for relief *prior* to bringing this action in District Court. The plaintiff asserts the Supreme Court has answered the later question in the negative.

In *Darby v. Cisneros,* 509 U.S. 137 (1993), the Supreme Court held that under the Administrative Procedure Act, 5 U.S.C. 704, a person aggrieved by an agency action can seek judicial review of the action without exhausting an available administrative appeal, unless the agency's regulations provide both (1) that the administrative appeal must be taken, and (2) that during the pendency of the administrative appeal the agency action shall be inoperative. In this regard the Court wrote:

> Under § 10(a) of the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, *is entitled to judicial review thereof.*" 5 U.S.C. § 702 (emphasis added). Although § 10(a) provides the general right to judicial review of agency actions under the APA, § 10(c) establishes when such review is available. When an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule, the agency action is "final for the purposes of this section" and therefore "subject to judicial review" under the first sentence. While federal courts may be free to apply, where appropriate, other prudential doctrines of judicial administration to limit the scope and timing of judicial review, § 10(c), by its very terms, has limited the availability of the doctrine of exhaustion of administrative remedies to that which the statute or rule clearly mandates.

*Id.* at 146.

In this matter, the government has not cited any regulation which requires that an administrative appeal be taken to either the agency itself or the FLRA by the plaintiff and that during the pendency of the administrative appeal the agency action shall be inoperative. The agency action has certainly become operative because the plaintiff's members have all suffered adversely from the agency's actions. At least one of the plaintiff's members has been fired for

14

over 14-months because of the agency's refusal to live up to its contractual word and

commitment.  That refusal is both final agency action and meets the "aggrieved by final agency

action" requirement of the APA.   The Court has jurisdiction to review this matter.

### 6.  The Plaintiff Exhausted its Administrative Remedies In This Case

As noted herein, with the amendment to 5 U.S.C. §7121(a)(1), the plaintiff contends that

it is not required to resort to the FLRA prior to bringing this action before the Court.  Even so,

the plaintiff asserts that it did exhaust its administrative remedies prior to bringing this action.  A

review of government Exhibits A-J demonstrated that the plaintiff attempted to resolve these

matters through the FLRA and exhausted the process with the FLRA.

In Exhibit A, Case WA-CA-06-0390, the defendant acknowledges that the charge was

filed and that it was withdrawn by the FOP on May 2, 2006.  It claims that by "voluntarily"

withdrawing the charge, the FLRA was never afforded the opportunity to adjudicate the merits.

What the government ignores is the fact that a voluntary withdrawal, ***solicited*** by the

FLRA,  is an adjudication of the charge on the merits.  The Court, through its experience, knows

that as it applies to the investigation and resolution of an unfair labor practice, the General

Counsel utilizes various devices to adjudicate the merits of a case and manage its workload.  One

of those methods is the *solicitation of a withdrawal* from the charging party by the regional

investigator.

A solicitation of a withdrawal from the charging party may occur if the regional office

decides there is not enough evidence to issue a complaint or that the conduct complained about

does not violate the Statute.  A solicitation of a withdrawal may also occur when the regional

office exercises its *prosecutorial discretion* and decides not to issue a complaint in spite of the

15

fact that a violation of the Statute occurred.  In practice, the regional investigator contacts the charging party, explains the reasons surrounding the decision to not issue a complaint and notice of hearing (CNOH), and solicits a withdrawal from the charging party.  If the charge is withdrawn, management is notified of the fact that the case has been withdrawn, but it is not told the reason why.   It will be obvious to management that the FLRA was going to drop the case, but management doesn't know the exact reasons for the FLRA decision.   For the charging party, the fact that the agency does not know the reasons behind the withdrawal can be very important. Both a solicited withdrawal and the exercise of prosecutorial discretion are unreviewable.

As it applies to a dismissal letter, that is when a charging party refuses to withdraw a charge, that dismissal can only be appealed an narrow grounds.[4]  Contrary to the government's

---

[4]    There are five basis for granting an appeal of a dismissal:

1.    The Region did not consider material facts. You must state the facts, and what evidence supports those facts (the testimony of a particular witness, for example, or a specific letter), and explain how those facts would result in finding a ULP.

2.    The Region's decision is based on a fact that is clearly erroneous. You must identify the erroneous fact, and what evidence establishes it is clearly erroneous, and then explain how a different factual finding would have resulted in finding a ULP.

3.    The dismissal is based upon an incorrect statement of law. You must explain why the rule of law relied on by the Region is incorrect, and what you think the correct rule of law would be.

4.    There is no Authority precedent on the legal issue in the case. You must identify the legal issue you believe is new, and state what rule of law you think should be argued to the Authority.

5.    The manner in which the investigation was conducted has resulted in prejudicial error. You must describe the improper manner in which the investigation was conducted, and explain why it was improper, and how it resulted in prejudicial error.

assertion, the refusal of the General Counsel to issue a CNOH is unreviewable. *see U.S. Department of Veterans Affairs, U.S. Department of Veterans Affairs Medical Center, Veterans Canteen Service, Newington, Connecticut*, 47 FLRA 631, 633-34, n.2 (1993)(General Counsel's decision to issue a complaint in one case and not in another, even if the circumstances are similar, is a matter of unreviewable prosecutorial discretion). *see also, Social Security Administration, Baltimore, Maryland and Social Security Administration, Area II, Boston Region, Boston, Massachusetts*, 39 FLRA 650, 655 (1991).

As it applies to Exhibit B, in Case WA-CA-06-0339, again, a voluntary withdrawal was solicited by the Chicago Region of the FLRA.   As it pertains to Exhibit C, in Case WA-CA-06-0671, September 14, 2007, the FOP again challenged the agency's refusal to meet with the union over the arbitration issue.  The FLRA solicited a withdrawal from the FOP.  The FOP then voluntarily withdrew the charge and the case was closed.[5]

As it applies to Exhibit D in Case WA-CA-06-0671, and Exhibit E, the FOP has never seen the agency response.  However, that charge was withdrawn by the FOP when the agency started to meet with the FOP and met to select an arbitrator on other unrelated arbitrations not part of this complaint.  As it applies to Exhibit F, in Case WA-CA-07-0371, this involved the removal of Police Officer Martin Mills which is the subject of this complaint.  In spite of the fact that the FOP provided evidence of the agency's refusal to meet with the FOP, the FLRA sought a voluntary withdrawal of the charge.  The union complied. In these cases, the plaintiff followed the procedure and the FLRA solicited a withdrawal. Thus, the plaintiff exhausted his administrative remedies with the FLRA.

---

[5]        *See* Exh. E Walsh Aff. ¶17.

The government's reliance on *Steadman v. U.S. Soldiers' & Airmens' Home*, 918 F.2d 963 (D.C. Cir. 1990), is distinguishable from the instant case on several fronts. First, *Steadman* is a pre-amendment statute case. As noted herein, Congress' amendment of Section 7121(a)(1) afforded the plaintiff to bring its claim to this Court. Similarly, the *Steadman* ruling was clarified two-years later by the D.C. Circuit's decision in *NTEU v. King*, 961 F.2d 240 (D.C. Cir. 1992). In that case, the union filed an action seeking injunctive relief alleging violation of its First Amendment rights. The district court dismissed the complaint for failure to exhaust administrative remedies in an FLRA proceeding. On review, the Court of Appeals reversed the district court. The government in this case, raises the precise argument rejected by the D.C. Circuit on *King*. As noted by the Court:

> As an initial matter, we reject the government's contention that the district court's dismissal of this action should be affirmed on the ground that federal question jurisdiction does not extend to the subject matter of the NTEU action. The government argues that because NTEU's statutory claim is within the exclusive jurisdiction of the FLRA, (citations omitted), the union's constitutional claim as well is barred. In *National Federation of Federal Employees v. Weinberger*, 818 F.2d 935, 940 (D.C. Cir. 1987), *cert. denied*, 493 U.S. 1056, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990), we repudiated a similar argument as a "discredited theory of subject matter jurisdiction," and specifically stated that our decisions "made it absolutely clear that federal employees may seek to enjoin governmental actions that violate their constitutional rights. This court's decision in *Steadman v. Governor, U.S. Soldiers and Airmen's Home*, 918 F.2d 963 (D.C. Cir. 1990), does not hold otherwise. In *Steadman* we addressed and clarified the strictures of the exhaustion doctrine, but in doing so we recognized that federal district courts clearly retain subject matter jurisdiction both when exhaustion has been satisfied but the administrative proceeding has left the constitutional injury unremedied and when the administrative proceeding cannot adequately redress the alleged constitutional deprivation.

*Id.* at 240.

In the case at bar, exhaustion was completed and the constitutional deprivation still exists. Of particular interest is the fact that throughout its motion, the government never informs the

18

Court that it will arbitrate the various grievances. Indeed, the unresponsiveness to counsel's September 4, 2007 and September 6, 2007, requests to arbitrate should demonstrate to the Court that the agency has no intention of arbitrating the various grievances. The plaintiff has exhausted it administrative remedy. Thus this case should be adjudicated on the merits.

Lastly, the remaining counts of the complaint, are premised on the Counts I and II. Thus, should the Court dismiss Count I & II, Counts III, IV and V would fail.

WHEREFORE plaintiff respectfully prays that this Honorable Court deny the defendant's motion to dismiss and grant the relief requested by the plaintiff in its complaint.

Respectfully submitted,

*/s/ Stephen G. DeNigris, Esq.*
Stephen G. DeNigris, Esq.
D.C. Bar No. 440697
Counsel for the Plaintiff
2100 M Street NW Suite 170-283
Washington, D.C. 20037

Office: (703)416-1036
Fax:    (703)416-1037

January 11, 2008
Albany, NY

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a copy of the foregoing Plaintiff's Opposition to the Defendant's Motion to Dismiss was sent by electronic mail (E-mail) to AUSA Benton Peterson, Esq., 555 4th Street, NW Washington, D.C.  20530 on the 11th day of January 2008, at Benton.Peterson@usdoj.gov.


_/s/ Stephen G. DeNigris, Esq._
Stephen G. DeNigris, Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

FRATERNAL ORDER OF POLICE, D.C.
LODGE 1, DPS LABOR COMMITTEE,
INC.

                    Plaintiff,

                                  CIVIL ACTION NO.: 07-cv-1624 (RMC)

ROBERT M. GATES, in his official
capacity as Secretary of the Department
of Defense
                    Defendant.
_____/

**O R D E R**

_____Upon consideration of the Defendant's Motion to Dismiss, the Plaintiff's Opposition to

said motion and the Defendant's Reply and for other good cause shown, it is hereby

      **ORDERED** that the Defendant's motion is **GRANTED / DENIED.**

                         _____
                         UNITED STATES DISTRICT JUDGE

Dated:  January _____, 2008.

FOP v. GATES
Civil Action 07-cv-1624 (RMC)

# EXHIBIT A



# UNITED STATES OF AMERICA

## BEFORE THE FEDERAL LABOR RELATIONS AUTHORITY

### WASHINGTON REGION

Office of the Secretary of Defense
Washington Headquarters Services
Real Estate and Facilities Directorate
Defense Protective Service
(Activity)

and

Fraternal Order of Police, DC 1
Defense Protective Service Labor Committee
(Labor Organization/Petitioner)

and

Pentagon Police Officers Association
International Union of Police Associations, AFL-CIO
(Labor Organization)

CASE NO.
WA-RP-80039

## CERTIFICATION OF REPRESENTATIVE

An election was conducted in the above matter under the supervision of the undersigned Regional Director of the Federal Labor Relations Authority, in accordance with the provisions of Chapter 71 of Title 5 of the U.S.C., and with the Regulations of the Federal Labor Relations Authority. A majority of the valid ballots has been cast for a representative for the purpose of exclusive recognition.

Pursuant to authority vested in the undersigned,

IT IS CERTIFIED that Fraternal Order of Police, DC 1, Defense Protective Service Labor Committee has been designated and selected by a majority of the employees of the above-named Activity, in the unit described below, as their representative for purposes of exclusive recognition, and that pursuant to Chapter 71 of Title 5 of the U.S.C., the named labor organization is the exclusive representative of all employees in the unit.

FLRA Form 28
(Rev. 1/96)

UNIT:

All Police Officers, Series 083, employed by the Office of the Secretary of Defense, Washington Headquarters Services, Real Estate and Facilities Directorate, Defense Protective Service in the Washington, D.C. metropolitan area, excluding all professional employees, management officials, supervisors, and employees described in 5 U.S.C.7112(b)(2), (3), (4), (6) and (7).

FEDERAL LABOR RELATIONS AUTHORITY

Barbara A. Leggett
Acting Regional Director
Washington Region

Dated: May 29, 1998
Attachment: Service Sheet

FLRA Form 28
(Rev. 1/96)

FOP v. GATES
Civil Action 07-cv-1624 (RMC)

# EXHIBIT B



# Department of Defense
# DIRECTIVE

NUMBER 5105.68

May 3, 2002

DA&M

SUBJECT: Pentagon Force Protection Agency

References: (a) Title 10, United States Code
(b) DoD Directive 5210.46, "DoD Building Security for the National Capital Region," January 28, 1982 (hereby canceled)
(c) DoD Directive 5105.53, "Director, Administration and Management," November 23, 1998
(d) Title 40, United States Code
(e) through (r), see enclosure 1

## 1. PURPOSE

This Directive:

1.1. Establishes the Pentagon Force Protection Agency (PFPA), pursuant to the authority vested in the Secretary of Defense by reference (a), with the mission, responsibilities, functions, relationships, and authorities, as prescribed herein; and cancels reference (b).

1.2. Authorizes future consolidation, within the PFPA, of activities related to force protection, security, and law enforcement in the National Capital Region (NCR) under the cognizance of the Director of Administration and Management (DA&M).

## 2. APPLICABILITY

This Directive applies to the Office of the Secretary of Defense, the Military Departments, the Chairman of the Joint Chiefs of Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities and all other organizational entities within the Department of Defense (hereafter referred to collectively as "the DoD Components").

## 3. MISSION

The mission of the PFPA is to provide force protection, security, and law enforcement, as required for the people, facilities, infrastructure and other resources at the Pentagon Reservation and for DoD activities and DoD-occupied facilities not under the jurisdiction of a Military Department within the NCR (hereinafter referred to as "the Pentagon Facilities"). This mission includes addressing the full spectrum of threats to the Pentagon Facilities by utilizing a balanced strategy of prevention, preparedness, detection, response, crisis management, and consequence management. The PFPA will be the DoD focal point for coordination with other DoD Components, other Executive Departments and Agencies, and State and local authorities on matters involving force protection, security, and law enforcement activities that impact the Pentagon Facilities.

## 4. ORGANIZATION AND MANAGEMENT

4.1. The PFPA is an agency of the Department of Defense, under the authority, direction, and control of the DA&M, in accordance with DoD Directive 5105.53 (reference (c)).

4.2. The PFPA shall consist of a Director and such subordinate organizational elements as are established by the Director within resources authorized by the Secretary of Defense.

## 5. RESPONSIBILITIES AND FUNCTIONS

The Director of the Pentagon Force Protection Agency shall provide the full range of services to protect personnel, facilities, infrastructure, and other resources at Pentagon Facilities, pursuant to the authorities of the Secretary of Defense under Section 2674 of reference (a), and those authorities delegated to the Secretary of Defense by the Administrator of General Services (GSA), under reference (d). In the exercise of these responsibilities, the Director, PFPA shall:

5.1. Organize, direct, and manage the PFPA and all assigned resources.

5.2. Establish systems and processes to:

5.2.1. Enable responsive and complete command and control of assigned personnel, forces, and other resources.

5.2.2. Enable prompt notifications, alerts, and coordination of crisis and consequence management operations with the DoD Components, Federal Agencies, and local jurisdictions.

5.2.3. Enable prompt and effective communication concerning the Pentagon Facilities to ensure the safe movement, control, or evacuation of personnel.

5.3. Establish, manage, and continuously operate operations and communications centers capable of supporting the requirements of the PFPA mission and the responsibilities of this Directive.

5.4. Provide security, in accordance with reference (e), and law enforcement for the Pentagon Facilities.

5.4.1. Enforce, and investigate violations of, Federal law and regulations. Ensure compliance with DoD policies pertaining to access, security, and emergency operations on Pentagon Facilities. Investigate allegations of misconduct by officers and other officials of the PFPA. Allegations against senior officials will be handled in accordance with reference (f).

5.4.2. Control access to Pentagon Facilities and to special events when required.

5.4.3. Maintain a response force capable of providing security commensurate with the designated Force Protection Conditions (FPCONs).

5.4.4. Provide personal protection for the Secretary of Defense, other DoD officials, and official visitors and dignitaries doing business with the Department of Defense, as required. Assess threats made against members of the DoD workforce, including senior DoD officials.

5.4.5. Coordinate law enforcement actions pertaining to Pentagon Facilities as required with Federal and local jurisdictions.

5.4.6. Provide technical security countermeasure (TSCM) support for designated Pentagon Facilities and other locations when specified in accordance with reference (e). Serve as the single coordinating agency for TSCM activities performed by other DoD Components at the Pentagon Reservation.

5.4.7. Provide services to meet physical security support requirements including locking devices, alarm systems, closed circuit television, parking, personnel identification badges, and other support requirements for Pentagon Facilities.

5.4.8. Provide information security and industrial security support for designated Pentagon DoD Components and other locations when specified in accordance with references (e), (g), and (h).

5.5. Be responsible for antiterrorism/force protection for Pentagon Facilities and implement an antiterrorism/force protection program for those Pentagon Facilities in accordance with references (i), (j), and (k). In meeting this responsibility:

5.5.1. Coordinate with the Department of Defense and Federal intelligence organizations to obtain terrorism-related intelligence information. Maintain a current terrorist threat assessment relevant to Pentagon Facilities and distribute pertinent information to designated DoD Component officials.

5.5.2. Ensure compliance with vulnerability assessments for Pentagon Facilities, in coordination with reference (l), and take action to mitigate vulnerabilities. Report uncorrected vulnerabilities to the DA&M.

5.5.3. Implement antiterrorism, force protection, and terrorism consequence management plans at Pentagon Facilities. Ensure plans are integrated with plans for emergency actions by the National Military Command Center and the command centers of the Military Departments, interagency response plans, community operations planners, local jurisdictions, and where appropriate, other DoD Components.

5.5.4. Provide for antiterrorism/force protection training and exercises for personnel at Pentagon Facilities in accordance with reference (j).

5.5.5. Direct changes in FPCONs and ensure that such information is distributed uniformly to designated officials at Pentagon Facilities. Monitor implementation of FPCON measures and assist the DoD Components at the Pentagon Facilities.

*DODD 5105.68, May 3, 2002*

5.6. Provide chemical, biological, and radiological (CBR) protection at Pentagon Facilities consistent with DoD policy, directives, and guidance concerning Chemical, Biological, Radiological, Nuclear, and Explosive (CBRNE) protection. In meeting this responsibility:

5.6.1. Provide scientific and technical advice on CBR threats, vulnerabilities, defenses, and consequence management pertinent to Pentagon Facilities to the DA&M and to the Secretary and Deputy Secretary of Defense, as required.

5.6.2. Implement CBR protection at Pentagon Facilities. Ensure protection and consequence management plans are integrated with plans for emergency actions by the National Military Command Center, command centers of the Military Services, interagency CBR response plans, continuity of operations planners, and where appropriate, other DoD Components. Also, ensure plans are coordinated with appropriate officials in jurisdictions where Pentagon Facilities are located.

5.6.3. Acquire, deploy, and maintain CBR equipment for detection and monitoring of CBR threats and protection of Pentagon Facilities personnel. Monitor and report incidents in accordance with plans. Provide for the modernization of CBR equipment to ensure capabilities are adequate to counter CBR threats.

5.6.4. Provide a CBR response force capable of a prompt response in support of First Responders to CBR incidents, including incidents involving the release of toxic substances. This force shall be capable of performing a full range of CBR operations including sampling, detection, identification, verification, mitigation, render safe, decontamination, advice and training on CBR matters, and operation and maintenance of CBR equipment. This full range of CBR operational capabilities will be exercised at least annually.

5.6.5. Prepare and conduct periodic tiered CBR training for the workforce, managers, and senior officials at Pentagon Facilities. The workforce, managers, and senior officials at Pentagon Facilities will exercise reaction to a CBR incident at least annually.

5.6.6. Coordinate with DoD medical activities to ensure that medical treatment plans include response to CBR attacks.

5.7. Provide security screening services for the operation of the Pentagon Remote Delivery Facility and its contingency mail facility. These services will include use of X-ray and other detection equipment to screen all packages and items delivered to designated Pentagon Facilities.

5.8. Operate the Pentagon Incinerator Plant to provide for the destruction of classified documents and other classified material in accordance with reference (m).

5.9. At facilities occupied by the DoD Components, but controlled by GSA, coordinate with GSA for the protection of DoD personnel. Where adequate force protection and security measures are not available from GSA and cannot be provided within the resources available to the PFPA, identify the affected organization to the DA&M so that resources can be made available, or organizations can be relocated to Pentagon Facilities where adequate protection is available.

5.10. Chair the Pentagon Security Advisory Group in accordance with reference (e).

5.11. Perform such other functions as may be assigned by the Secretary or Deputy Secretary of Defense, consistent with applicable laws and regulations.

## 6. RELATIONSHIPS

6.1. In the performance of assigned functions and responsibilities:

6.1.1. The Director, PFPA, shall coordinate and exchange information and advice with the DoD Components and other Federal, State and local agencies having collateral or related responsibilities.

6.1.2. The Heads of DoD Components shall coordinate with the Director, PFPA, as appropriate, on matters relating to PFPA operations, functions, and responsibilities.

6.2. Unless otherwise directed by the Secretary or the Deputy Secretary of Defense, the law enforcement responsibilities assigned by this Directive do not replace or supersede those responsibilities currently assigned to the Defense Criminal Investigative Service, the U.S. Army Criminal Investigative Command, the Naval Criminal Investigative Service, or the Air Force Office of Special Investigations, as the Defense Criminal Investigative Organizations, or the law enforcement and oversight authority of the Inspector General of the Department of Defense in accordance with references (n) and (o).

*DODD 5105.68, May 3, 2002*

## 7. AUTHORITIES

The Director, PFPA, or designee, is specifically delegated authority to:

7.1. Act as the DoD principal liaison with the GSA and State and local authorities for force protection, security, and law enforcement at Pentagon Facilities in the NCR.

7.2. Communicate directly with the DoD Components and other Executive Departments and Agencies, as necessary, in carrying out assigned responsibilities and functions.

7.3. Obtain reports and information consistent with reference (p), as necessary, to carry out assigned functions.

7.4. Exercise the administrative authorities contained in enclosure 2.

## 8. ADMINISTRATION

8.1. The Director, PFPA, shall be selected by, and report to, the DA&M.

8.2. PFPA shall be authorized such personnel, facilities, funds, and other administrative support as the Secretary of Defense deems necessary.

8.3. The Military Departments shall assign military personnel to PFPA in accordance with approved authorizations and established procedures for assignment to joint duty.

8.4. Administrative support for PFPA shall be provided by the Washington Headquarters Services (WHS) under reference (q) or, as required, by selected DoD Components through inter-Service support agreements in accordance with reference (r).

*DODD 5105.68, May 3, 2002*

9. EFFECTIVE DATE

This Directive is effective immediately.

Paul Wolfowitz
Deputy Secretary of Defense

Enclosures - 2
    E1. References, continued
    E2. Delegations of Authority

8

FOP v. GATES
Civil Action 07-cv-1624 (RMC)

# EXHIBIT C



STEPHEN G. DENIGRIS
ADMITTED IN FL, NY, D.C.

2100 M STREET, N.W.
SUITE 170-283
WASHINGTON, D.C. 20037-1233

TELEPHONE: 703-416-1036
TELECOPIER: 703-416-1037



**BY FACSIMILE (703)614-8239**
**AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED 7007-1490-0002-2616-3099**

September 4, 2007

Renee Coates
Director of Personnel
Pentagon Force Protection Agency
9000 Defense Pentagon
Washington, DC 20301-9000

      Re:    Renewed Demand to Select Arbitrators

Dear Ms. Coates:

      This office represents the Fraternal Order of Police. Over the past several months, the FOP has requested to meet with your office concerning the selection of arbitrators on several disciplinary matters. My records reflect the following panels have been received by the parties and that the selection of an arbitrator is presently outstanding:

| | | | |
|---|---|---|---|
| FTEP | - | | FMCS 04-08228 & 08229 |
| Tiffany Chessier | - | AWOL and Leave | FMCS 05-0923-57920-A |
| Walter Jones | - | Medical Removal | FMCS 05-0923-58153-A |
| Michael Walsh | - | Physical | FMCS 05-0809-58137-A |
| Union Time | - | Official Time | FMCS 06-0111-01553-A |
| Off. Lawrence | - | Performance | FMCS-06-0111-01559-A |
| Quesada/Bocock | - | Performance Appraisals | FMCS 06-0111-01560-A |
| Kenneth Nichols | - | Disciplinary Suspension | FMCS 06-0112-01594-A |
| Jason Whitney | - | Disciplinary Suspension | FMCS 06-0112-01597-A |

A PROFESSIONAL CORPORATION REPRESENTING LAW ENFORCEMENT OFFICERS AND PUBLIC EMPLOYEES AT THE FEDERAL, STATE, AND LOCAL LEVELS
INTERNET: SGD853@AOL.COM

| FOP Conference 2006 - | | Official Time | FMCS 06-0602-01595-A |
| Labront Makle | - | Disciplinary Suspension | FMCS 06-0602-03799-A |
| Talbert/Scott/Rajah | - | Disciplinary Actions | FMCS 06-0602-03803-A |
| Marty Mills | - | Removal | FMCS 07-0301-54252-A |

I would like to have someone authorized from your staff to contact me by telephone at (703)416-1036 on Wednesday, September 5, 2007, so that we can complete the selection process on these matters by telephone. The delay, as it applies to the various disciplinary actions and removals is particularly important as these employees and the agency deserve a speedy resolution of the cases as they involve back pay and attorney fees.

Sincerely,

Stephen G. DeNigris, Esq.
Chief Legal Counsel to the FOP

FOP v. GATES
Civil Action 07-cv-1624 (RMC)

# EXHIBIT D

# LAW OFFICES OF STEPHEN G. DE NIGRIS

STEPHEN G. DENIGRIS
Admitted in FL, NY, D.C.

2100 M STREET, N.W.
SUITE 170-283
WASHINGTON, D.C. 20037-1233

TELEPHONE: 703-416-1036
TELECOPIER: 703-416-1037



**BY FACSIMILE (703)697-1068**

September 6, 2007

Don Perkal, Esq.
Deputy General Counsel
Washington Headquarters Services
1155 Defense Pentagon
Washington, D.C. 20301-1155

    Re:    PFPA Refusal to Select Arbitrators

Dear Mr. Perkal:

    I am writing concerning the agency's continued refusal to meet and select arbitrators with the FOP. I wrote Ms. Coates on September 4, 2007, asking her to have someone from her staff call me so that we could do the selections by telephone in order to expedite these matters. I received no response. Some of these cases are from 2004 and 2005. Presently, the following arbitration panel selections are pending:

| | | | |
|---|---|---|---|
| FTEP | - | | FMCS 04-08228 & 08229 |
| Tiffany Chessier | - | AWOL and Leave | FMCS 05-0923-57920-A |
| Walter Jones | - | Medical Removal | FMCS 05-0923-58153-A |
| Michael Walsh | - | Physical | FMCS 05-0809-58137-A |
| Union Time | - | Official Time | FMCS 06-0111-01553-A |
| Off. Lawrence | - | Performance | FMCS-06-0111-01559-A |
| Quesada/Bocock | - | Performance Appraisals | FMCS 06-0111-01560-A |
| Kenneth Nichols | - | Disciplinary Suspension | FMCS 06-0112-01594-A |
| Jason Whitney | - | Disciplinary Suspension | FMCS 06-0112-01597-A |
| FOP Conference 2006 - | | Official Time | FMCS 06-0602-01595-A |

A PROFESSIONAL CORPORATION REPRESENTING LAW ENFORCEMENT OFFICERS AND PUBLIC EMPLOYEES AT THE FEDERAL, STATE, AND LOCAL LEVELS
INTERNET: SGD853@AOL.COM

| Labront Makle | - | Disciplinary Suspension | FMCS 06-0602-03799-A |
| Talbert/Scott/Rajah | - | Disciplinary Actions | FMCS 06-0602-03803-A |
| Marty Mills | - | Removal | FMCS 07-0301-54252-A |

I am especially concerned over the disciplinary matters pending arbitrator selection. I believe it is a denial of the employees' due process rights when the agency fails or refuses to select an arbitrator from an FMCS panel. Accordingly, absent agency contact with me to select an arbitrator from the various panels, I will initiate action in federal district court on September 12, 2007. I am willing to do this by telephone in order not to inconvenience agency personnel. I have the lists of panels for each case listed. I am providing my private cell number (571-220-9341) in order to further expedite these matters.

Sincerely,

Stephen G. DeNigris, Esq.

FOP v. GATES
Civil Action 07-cv-1624 (RMC)

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

FRATERNAL ORDER OF POLICE, D.C.
LODGE 1, DPS LABOR COMMITTEE,
INC.

Plaintiff,

CIVIL ACTION NO.: 07-cv-1624 (RMC)

ROBERT M. GATES, in his official
capacity as Secretary of the Department
of Defense

Defendant.

_____/

## AFFIDAVIT OF MICHAEL WALSH

Pursuant to 28 U.S.C. §1746, Michael Walsh declares and affirms under penalty of

perjury:

1.     I am the Chief Steward of the Fraternal Order of Police, D.C. Lodge 1, DPS Labor

Committee, the plaintiff in this case.

2.     I make this declaration and affirmation based upon personal knowledge.

3.     I have been the chief steward of the union since 2004.  I am also the custodian of

the records for the union's grievances, arbitrations and unfair labor practice charges.

4.     I personally processed the grievances and the demands for arbitration in this case.

5.     When a demand for arbitration was made, it was accomplished through the

agency's e-mail system.  When I e-mailed a request to arbitrate, I would generally receive a

confirmation from the e-mail system that the demand had been received.

6.     I would then file a request with the Federal Mediation and Conciliation Service

and request a list of arbitrators describing in general terms the nature of the arbitration request

and pay a $50.00 filing fee for each panel.

      7.     The agency contact and address was also indicated on the FMCS request.  So

there is no doubt that the agency received a copy of the arbitration panel I requested.

      8.     Article 51 of the agreement between the FOP and the defendant provides:

Section 51.01  Arbitration

a.     Within twenty (20) days following a receipt of a decision at Step 3, the party who
initiated the grievance will notify the other party if it intends to submit the matter
to arbitration.  Within seven (7) days after notification, the moving party will
request a panel of arbitrators from the Federal Mediation and Conciliation Service
(FMCS) or any other source.  Within fourteen (14) days from receiving a list of
arbitrators, the Parties will select an arbitrator.  If the panel is unacceptable to
either party one additional panel may be requested.  If the Parties cannot agree
upon an arbitrator, they will strike one (1) name from the list alternately and then
repeat this procedure until only one (1) name remains.  The person whose name
remains will be selected as the arbitrator.  The party striking the first name from
the list in each case will be chosen by a coin toss or otherwise as agreed.

      9.     As the chief steward of the union, I complied with the provisions of Section 51.01

in that following a receipt of a decision at Step 3 of the grievance procedure on behalf of all

named plaintiffs;

a.     notified the defendant of its intention to submit disputed matters to arbitration;

b.     requested a panel of arbitrators from the FMCS within seven days after

notification; and

c.     within fourteen days after receiving a list from FMCS, the FOP requested that the

parties meet for the purpose of selecting an arbitrator.

      10.    My agency counterpart was Director of Labor Relations Mike Flynn.  Once I

received a FMCS panel listing arbitrators,  I would e-mail or call by telephone Mr. Flynn, Wanda

Tonic or Renee Coates. Meetings with these individuals were requested not once but numerous times.

11.    Despite my best efforts, the agency would not respond to my telephone calls or e-mails.

12.    I generally dealt with Mick Flynn on most things. On those matters delegated to Wanda Tonic, I dealt with her. Mr. Flynn's office maintained the union's grievances and other labor-relations matters. However, it is my understanding that Mike Flynn was removed by the agency for misconduct. What Mr. Flynn did with the union's various demands and requests is unknown to me.

13.    When I could not get the agency to respond to the union's repeated requests for arbitration, I started filing unfair labor practice charges with the FLRA. In some instances, the case was assigned to the Washington Region. In other cases, the ULP may have been transferred to another region for investigation.

14.    Subsequently, I learned that the FLRA Washington Region was staffed with only two individuals to investigate charges. Thus, it became apparent to me as the chief steward that the FLRA would solicit a withdrawal at almost opportunity.

15.    When I filed an unfair labor practice charge concerning the agency's refusal to select an arbitrator, the charge generally encompassed several cases.

16.    The FLRA refused to issue a complaint on the various charges I filed claiming that my repeated e-mails to the agency requesting to meet to select or my telephone calls were not sufficient to demonstrate a violation of the Statute.

17.    The FLRA would then solicit a withdrawal of the charge from me. I would

3

withdraw a charge rather than have it dismissed. By the time the FLRA had completed its investigation of my charges, the statute of limitations had generally passed and the case was over. There was no further remedy to pursue.

18.     The following arbitration panel cases are presently pending:

| | | | |
|---|---|---|---|
| FTEP | - | | FMCS 04-08228 & 08229 |
| Tiffany Chessier | - | AWOL and Leave | FMCS 05-0923-57920-A |
| Walter Jones | - | Medical Removal | FMCS 05-0923-58153-A |
| Michael Walsh | - | Physical | FMCS 05-0809-58137-A |
| Union Time | - | Official Time | FMCS 06-0111-01553-A |
| Off. Lawrence | - | Performance | FMCS-06-0111-01559-A |
| Quesada/Bocock | - | Performance Appraisals | FMCS 06-0111-01560-A |
| Kenneth Nichols | - | Disciplinary Suspension | FMCS 06-0112-01594-A |
| Jason Whitney | - | Disciplinary Suspension | FMCS 06-0112-01597-A |
| FOP Conference 2006 - | | Official Time | FMCS 06-0602-01595-A |
| Labront Makle | - | Disciplinary Suspension | FMCS 06-0602-03799-A |
| Talbert/Scott/Rajah | - | Disciplinary Actions | FMCS 06-0602-03803-A |
| Marty Mills | - | Removal | FMCS 07-0301-54252-A |

19.     Despite continuous and repeated efforts by the FOP to have the defendant meet with it and select an arbitrator, the agency refuses to acknowledge repeated requests to meet and select an arbitrator.

20.     On September 4, 2007, our attorney wrote Personnel Director Renee Coates, asking her to have an individual contact the FOP to select an arbitrator in the above referenced

4

matters.

21.     As was the common practice of the defendant, there was no response from the defendant's personnel director.

22.     On September 6, 2007, our attorney wrote the agency's deputy general counsel in an effort to have an individual contact the FOP to select and arbitrator in the above-referenced matter.

23.     Again, there was no response from the defendant's deputy general counsel.

24.     On September 28, 2007, the agency sent the FOP chairman a letter wanting to meet to discuss the merits of the various grievances.

25.     By letter dated October 2, 2007, our lawyer responded to the agency and informed them of the fact that his letters of September 4, 2007, and September 6, 2007, with the listed arbitration had gone unanswered. Our counsel all asserted that before any further discussions on the merits of the grievances, the agency must select an arbitrator for the outstanding grievances.

26.     Our lawyer further reminded the agency that the FOP had requested that the agency respond to him by September 12, 2007, as the FOP would file suit after that date if the agency did not contact him.

27.     Our attorney has represented the FOP since 1995. He is well-known to the agency and they know how to contact him. Despite counsel's best efforts, his letters were ignored.

28.     To date, the agency still refuses to select an arbitrator.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 1/11/2008.

Michael Walsh